IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

**MICHAEL COCHRAN, et al.**                                                              **PLAINTIFFS**

VS.                                    Case No. 03-CV-1111

**QUAIL PIPING PRODUCTS, INC., et al.**                                              **DEFENDANTS**

### MEMORANDUM OPINION

Plaintiffs Michael Cochran, individually and as the administrator of the estate of Jennifer Ashley Cochran, deceased, Rita Kaye Lewis and Randi Roden (collectively "Plaintiffs") bring this lawsuit against Quail Piping Products, Inc. ("Quail Piping") and the Louisiana and Northwest Railroad, Co. ("Railroad")(collectively "Defendants") alleging Defendants' negligence resulting in the death of Jennifer Cochran. Two motions are before the Court: (1) Quail Piping's Motion for Summary Judgment (Doc. 21); and (2) Louisiana Northwest's Motion for Summary Judgment (Doc. 25). Plaintiffs have responded. The Court finds these motions ripe for consideration, and the Court can resolve both motions in a single memorandum opinion.

**I.     Background**

On the morning of March 20, 2004, Jennifer Cochran and her stepbrother David Loveless climbed onto a set of hopper rail cars, parked on a side track adjacent to the Quail Piping Products plant in Magnolia, Arkansas. The rail cars were filled with resin pellets. They walked across the top of the first car and found its hatches were locked. They stepped across a gap to the second car and found that its third hatch was unlocked, and Jennifer and David lowered themselves down and played among the pellets that filled the car. Jennifer and David played in the car for some time, but for less than one-half an hour. While they played, Jennifer sat down and covered her legs with pellets. After covering her legs, Jennifer tried to stand up, but couldn't, so David climbed out of the rail car and ran to a nearby church to get help. David saw U.S. Hill, Jr., standing outside of the church, and David told Hill that Jennifer was trapped in a

rail car and needed help. David ran back to the rail car and Hill drove his van. When David and Hill returned to the rail car and looked inside, they couldn't see Jennifer; she had slipped under the pellets. Hill called the authorities on his cellular phone. Help arrived, but when Jennifer was finally pulled from the pellets, it was too late. She had died of suffocation. It was unknown to Jennifer and David that while they played in the rail car, its contents were being unloaded by vacuum hoses into the Quail Piping plant.

Jennifer admits that she went to the premises of Quail Piping without the permission of Quail Piping and without an invitation from Quail Piping. Jennifer was twenty-two years old at the time of her death, and David was fourteen-years old. After discovery, and a stay of this lawsuit while Quail Piping was in bankruptcy, Defendants have moved for summary judgment.

**II.    Discussion**

The standard of review for summary judgment is familiar and established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Krenik v. County of Le Sueur, 47 F.3d 953 (8th Cir. 1995).

The Supreme Court has issued the following guidelines to help determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial . . . whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). See also Agristor Leasing v. Farrow, 826 F.2d 372 (8th Cir. 1987); Niagra of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund, 800 F.2d 742, 746 (8th Cir. 1986).

The burden of proof is on the moving party to set forth the basis of its motion. Donovan v. Harrah's Maryland Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002), citing Celotex Corp v.

Catrett, 477 U.S. 317, 323 (1986). The Court must view all facts and inferences in the light most favorable to the nonmoving party. Id., citing Matsushia Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). The Eight Circuit Court of Appeals, in Scheer Const. Co. v. Greater Huron Development Corp., 700 F.2d 463, 465 (8th Cir. 1983), quoting Burst v. Adolph Coors Co., 650 F.2d 930, 932 (8th Cir. 1981), in a case involving the entry of summary judgment, stated:

> [w]hen a motion for summary judgment is made and supported by affidavits, the party opposing the motion may not rest on the allegations in his pleadings but must resist the motion by setting forth specific facts that raise a genuine issue of fact for trial.

If a plaintiff has the burden of proof at trial on a claim and the defendant has filed a motion for summary judgment, the plaintiff must identify admissible evidence sufficient to make a submissible case at trial. Celotex, at 323-24. If the plaintiff cannot identify such facts, the defendant is entitled to judgment as a matter of law. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990), quoting Celotex, 477 U.S. at 322).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co.., 475 U.S. at 586. Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. Anderson, 477 U.S. at 248.

A. **Separate Defendant Louisiana and Northwest Railroad, Co., are entitled to summary judgment because it did not own or control the railcar or land at the time of Jennifer's death**.

The undisputed facts show that at the time of Jennifer's death the Railroad and Quail Piping were parties to a Railroad Sidetrack Agreement. At the time of Jennifer's death, the hopper rail car was on the Quail Piping sidetrack and being unloaded by Quail Piping employees. The Railroad owed no duty with respect to the hopper car and its contents over which it had no ownership or control.

Even if the Railroad could somehow be liable to Jennifer through some type of ownership interest in the rail car, it would still be entitled to summary judgment because, as discussed

below, the only reasonable conclusion that can be drawn from the evidence is that Jennifer was an undiscovered trespasser to whom the Railroad owned no duty at law.

B.  **The Defendants are entitled to summary judgment because the only reasonable conclusion that can be drawn from the evidence is that Jennifer was an undiscovered trespasser, whom the Defendants owed no duty at law**.

The Motions for Summary Judgment put Jennifer's status as a trespasser or licensee directly before the Court. The Arkansas law of premises liability is clear. A trespasser is one who comes upon land without the consent of the possessor. Coleman v. United Fence Co., 282 Ark. 344, 345, 668 S.W.2d 536, 537 (1984). The duty owed to trespassers is embodied in Ark. Code Ann. § 18-60-108. No duty is owed to an undiscovered trespasser, but once the trespasser's presence is known, the landowner owes the trespasser only a duty not to cause her injury by willful or wanton conduct. Id. Although Plaintiff cites the Court to Aluminum Co. of America v. Guthrie, 296 Ark. 269, 274-275, 753 S.W.2d 538, 541-542 (1988)(Glaze, J., concurring), for the proposition that a broader duty is owed to trespassers (when their presence reasonably should have been known), this case predates Ark. Code Ann. § 18-60-108, and the Arkansas Model Jury Instructions have been revised to reflect the current status of Arkansas law (requiring actual knowledge of a trespasser's presence before any duty is owed).

Turning to the summary judgment record, there is no evidence that Jennifer's presence was actually known to the Defendants and there is no evidence that Defendants acted willfully and wantonly in causing Jennifer's death. Therefore, unless genuine issues exist as to Jennifer's status as a licensee, Defendants are entitled to summary judgment, because they owed her no duty at law.

A licensee is someone who is on the premises of a landowner under an express or implied invitation, for one's own purposes and not for the mutual benefit of oneself and the owner. Bader v. Lawson, 320 Ark. 561, 564, 898 S.W.2d 40, 42 (1995). See also, Heigle v. Miller, 332 Ark. 315, 319, 965 S.W.2d 116, 119 (1998)(defining "licensee" as one who goes onto the premises of another with the consent of the owner for one's purposes and not for the mutual benefit of oneself

and the owner). The distinction drawn by Arkansas case law between trespassers and licensees seems to be the landowner's consent to the presence of the licensee or, put another way, the landowner's express or implied invitation to the licensee to be on the premises. This distinction is consistent with Ark. Code Ann. § 18-60-108(c), which defines a trespasser to mean a person who enters the property of another without permission and without an invitation, express or implied.

The Restatement Second of Torts indicates that the word consent or permission indicates that the possessor is in fact willing that the other shall enter or remain on the land, or that his conduct is such as to give the other reason to believe that he is willing that he shall enter, if he desires to do so. RESTATEMENT (SECOND) OF TORTS § 330 cmt. c. (1965). The Restatement further clarifies the meaning of consent and permission:

> A mere failure to object to another's entry may be a sufficient indication or manifestation of consent, if the possessor knows of the other's intention to enter, and has reason to believe that his objection is likely to be effective in preventing the other from coming. On the other hand, the fact that the possessor knows of the intention to enter and does not prevent it is not necessarily a manifestation of consent, and there is not necessarily permission. A failure to take burdensome and expensive precautions against intrusion manifests only an unwillingness to go to the trouble and expense of preventing others from trespassing on the land, and indicates only toleration of the practically unavoidable, rather than consent to the entry as licensee. Even a failure to post a notice warning the public not to trespass cannot reasonably be construed as an expression of consent to the intrusion of persons who habitually and notoriously disregard such notices. The consent which is necessary to confer a license to enter land, may be expressed by acts other than words . . . the decisive factor is the interpretation which a reasonable man would put upon the possessor's acts. In determining whether a particular course of action is sufficient to manifest a consent to enter the land, consideration must be given to all of the surrounding circumstances. If a railway company prepares a paved or boarded path across its tracks, it may or may not give members of the public reason to believe that the pathway is prepared for their use. If there is no other crossing available within a considerable distance, and there are no warning signs to the contrary, the public may reasonably assume that the path is meant for public use. On the other hand, if there is a street crossing close by, and the railroad pathway is closed by a gate, such an assumption might not be justified. So too, the paths or bridges in a factory or freight yard may be so located as obviously to be prepared only for the use of employees. In determining this, account must be taken of customs prevailing in the community. "The well-established usages of a civilized and Christian community" entitle everyone to assume that a possessor of land is willing to permit him to enter for certain purposes until a particular possessor expresses unwillingness to admit him. So too, if there is a local

custom for possessors of land to permit others to enter it for particular purposes, residents in that locality and others knowing of the custom are justified in regarding a particular possessor as conversant with it and, therefore, in construing his neglect to express his desire not to receive them as a sufficient manifestation of a willingness to admit them. Thus, if it be a custom in a particular town for owners of vacant land to permit persons to cut across it, one doing so is a licensee unless by posted notice or otherwise the particular owner objects to the practice. Familiar intimacy may also justify the assumption of consent to such visits as friends customarily pay to one another. Id.

Once a person is found to be a licensee, the duties owed by a landowner are similar to those owed to a trespasser, but the differences, although few, are significant. Landowners owe licensees no duty until their presence is known, or the landowner reasonably should have known of their presence. This seems to be a divergence from the duty owed to a trespasser, because a landowner may owe a licensee a duty when it "should have known" of the licensee's presence, as opposed to trespassers, who it appears are owed no duty until they are actually discovered. Once the discovery element is satisfied for licensees, the landowner owes the licensee a duty not to cause injury by willful or wanton conduct. Heigle, 332 Ark. at 321. To constitute willful of wanton conduct, there must be a deliberate intention to harm or an utter indifference to, or conscious disregard of, the safety of others. Young v. Paxton, 316 Ark. 655, 661, 873 S.W.2d 546, 550 (1994). A landowner owes a licensee no duty to make the premises safe or to warn them of obvious or patent dangers. Dorton v. Francisco, 309 Ark. 472, 474, 833 S.W.2d 362, 365 (1992). However, a landowner also owes a licensee a duty of ordinary care in two situations: (1) when the landowner knows that a licensee is in a position of danger, the landowner is under a duty to use ordinary care to avoid injury to the licensee; and (2) when the landowner knows or has reason to know of a condition on the premises which is not open and obvious and which creates an unreasonable risk of harm to licensees, the landowner is under a duty to use ordinary care to make the condition safe or to warn those licensees who do not know or have reason to know of the danger. Young, 316 Ark. at 661.

In this case Plaintiffs ask the Court to find genuine issues that show Defendants' consent to the presence of Jennifer or, put another way, the Defendants' express or implied invitation for

Jennifer to be on the premises. Once this hurdle is met, the Plaintiffs then ask the Court to find genuine issues that Defendants knew or had reason to know of a condition on the premises which is not open and obvious and which created an unreasonable risk of harm to licensees, and therefore Defendants are under a duty to use ordinary care to: (1) make the condition safe, or (2) warn those licensees who do not know or have reason to know of the danger.

The Court must first decide whether a reasonable jury could find that Jennifer could meet the definition of a licensee. It cannot be disputed that Jennifer was on the premises of Defendants for her own purposes and not for the mutual benefit of herself and Defendants. Plaintiffs' claim fails on the second part of the definition of a licensee (the landowner's consent to the presence of the licensee or, put another way, the landowner's express or implied invitation to the licensee to be on the premises).

Plaintiffs argue Quail Piping knew unauthorized individuals had been on, in and around the sidetrack and its manufacturing facility in Magnolia, Arkansas. Deposition of John Westbrook, Quail Piping Plant Manager, pg. 36, lines 1-9, 13-16, 20-25 (ex. A)(Q: Do you know, Mr. Westbrook, whether people randomly and routinely walked or went four-wheeling across the tracks at Quail, in and out of the property? A: I had seen on occasion a four-wheeler coming up by the tracks. No on our side, not on the spur side, I'm talking about the main track . . . I can count them on my hand how many times I've seen them. As far as seeing people . . . on the track, I can count on one hand in five years, and it was usually an older guy that lived down the road. I [saw] what I would call minors on one occasion . . . they were together, about five or six - there was an adult with them and they were only on the main track and they never stopped.); Deposition of Chase Loveless, pg. 39 (Ex. B), Quail Piping Safety Meeting Minutes, May 3, 2001, Bates No. 790912/46204-01310 (Ex. C)("People who do not work in this plant are unauthorized people. We have to (sic) many of these unauthorized people coming into the plant. Visitors are to report to the front office during the day and to the supervisors on duty at night, But under NO circumstances do they come into the plant.")

Viewing this evidence in the light most favorable to Plaintiffs, no reasonable jury could find that Jennifer was anything other than an undiscovered trespasser, and, as such, Defendants owed her no duty at law.  Defendants' conduct was not such that could reasonably be found to lead Jennifer to believe that Defendants were willing that she enter.

**III.    Conclusion**

For the foregoing reasons, the Court finds Defendants' Motions for Summary Judgment (Doc. 21)(Doc. 25) should be and hereby are **granted** and Plaintiffs' lawsuit is dismissed with prejudice.

**IT IS SO ORDERED** this 27th day of October, 2005.

/s/ Harry F. Barnes
Hon. Harry F. Barnes
U.S. District Judge